# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ROBERT CLAY, JR.,

               Plaintiff,

v.

GREENDALE SCHOOL DISTRICT, KIMBERLY AMIDZICH, and JULIE GROTOPHORST,

               Defendants.

Case No. 21-CV-66-JPS

**ORDER**

## 1.    INTRODUCTION

On January 14, 2021, Plaintiff Robert Clay, Jr. ("Clay") filed the present civil rights action, alleging that Defendants wrongfully terminated him from his public-school teaching position. ECF No. 1. On March 1, 2022, Defendants filed a motion for summary judgment. ECF No. 14. That motion is fully briefed, and the Court will grant it.

## 2.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A "genuine" dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in a light most favorable to the nonmovant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing

the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010).

### 3.    RELEVANT FACTS[1]

### 3.1    Clay's Employment with the Greendale School District

Clay first began employment with the Greendale School District (the "District") on approximately January 3, 2018 as a French teacher. Initially, Clay was a part-time employee while another teacher was on maternity leave. Following the teacher's maternity leave, Clay continued to work as a substitute teacher for the remainder of the school year. That summer, Clay also taught in the District's 2018 summer enrichment program, which ended in August 2018.

Clay was re-hired with the District for the 2019–2020 school year as a part-time French teacher. His supervisor was John Weiss ("Weiss"), who had been principal of Greendale Middle School since 2008. Weiss, as principal, would generally speak with Clay, for any reason, a couple of times a week.

### 3.2    Classroom Interaction and Subsequent Investigation

As part of his duties, Weiss investigates concerns regarding teacher behavior and performance. Following an investigation, Weiss shares the information with the Human Resources Director, Julie Grotophorst ("Grotophorst").

---

[1]The parties submitted a stipulated statement of undisputed material facts. ECF No. 15 at 2–9. For purposes of summary judgment, the Court will adopt the stipulated facts with minor, non-substantive edits.

On December 3, 2019, some students in Clay's class returned from a field trip that involved seeing a play. The students who had been on the field trip were dressed up. Clay commented that the students were all dressed up that day. The students (jokingly) told Clay that they were going to a wedding, and one student added that her female friend in the class was going to be her husband. Clay then commented to the female student who had been identified as the "husband" that he did not know she was a boy. Multiple students responded by saying "you can't discriminate" or "that's discrimination" and similar remarks. Both Clay and the students described the conversation as playful or light-hearted.

On the evening of December 3, 2019, Clay sent an email to seven students from his French class. He sent the email only to the same students with whom Clay had the discussion in his classroom earlier in the day. Clay sent the email using his District email account, which was delivered to the students' District email accounts. Generally, teachers email students using the District's email system for curriculum or instruction related purposes. The students did not ask for Clay to email them, and Clay did not notify anyone in the District's administration, including Weiss, that he was emailing students about the conversation that took place in the classroom.

Clay's email, with the subject line "dans notre classe de français" (translated "in our French class"), states,

Bonsoir,

Your effort and participation in French today was 'au top'! My message was light on instruction, because the 6th hour Frenchies were on a field trip, hence, I think the online activity was okay during so many absences.

On a different note, I want to address the playful conversation in the back row about gay marriage. When a student

mentioned my 'discrimination' I want to share that words were placed in my mouth. I support all of my Frenchy students. You all offer me insight about your background and family history!

But if you were asking me to support LGBT marriage, that is an issue that I definitely oppose. Alas, it is my belief that does not change with pop culture.

In closing, a few years ago—when you were in elementary school—the majority of Californians voted on two occasions against the legalization of this marriage. These millions of people I agreed with in their abjection. More recently, the Supreme Court voted 5 to 4 that LGBT marriage should be legal.

With that said, it is best in society that we respect one another's differences.

Best,

Monsieur Robert

ECF No. 20. Prior to sending this email to students, Clay did not notify Weiss that he felt as though he had been accused of discrimination.

The email that Clay sent was outside of the context of his class. It was not sent in response to any questions raised by the students, and it was not related to Clay's French curriculum. Clay's French curriculum consisted of French language lessons and did not include general politics or gay marriage. Although Clay's comments regarding same-sex marriage were not related to his job duties, Clay sent the email in response to the students accusing him of discrimination earlier that day.

Weiss became aware of the email the following morning. Approximately six students came to Weiss's office to discuss the email that they received. The students were upset by the email and were concerned that they had received it. Following receipt of the students' concerns, Weiss

received parent complaints about the inappropriateness of emailing a specific group of students, the content of the email, the opinion shared by Clay, as well as one parent stating that their student felt uncomfortable returning to the classroom.

After his discussions with the students, Weiss escalated the issue to Grotophorst. Weiss escalated the issue because he believed that the contents of Clay's email were outside the scope of Clay's French class and because some students had expressed concerns about feeling safe and returning to the classroom. Weiss and Grotophorst had a meeting to discuss Clay's email and then decided to meet with Clay as the next step in the investigation in order to get his version of the events.

In meeting with Clay, Weiss did not feel as though Clay understood that his email was inappropriate. Grotophorst felt as though Clay was unable to understand why there were concerns about the content of the email he sent or the impact that the email had on students. Clay told Weiss and Grotophorst that he sent the email because he was upset and felt that the students had accused him of being discriminatory, which he did not understand.

Grotophorst felt that Clay's email created an environment in which students did not feel safe or comfortable in Clay's classroom. Weiss believed that the email was inappropriate because it was not in the context of Clay's class, was not solicited by the students, and was not part of Clay's curriculum.

### 3.3    Clay's Suspension and Subsequent Termination

Following the meeting, the District suspended Clay with pay, and he did not return to his classroom, a decision that was made jointly by Weiss and Grotophorst. On December 10, 2019, Clay received a letter from

Kimberly Amidzich ("Amidzich"), Interim Superintendent of Schools, notifying him that he was being recommended for termination due to the alleged violation of District policies. Clay was notified that the District considered the email he sent on December 3, 2019 to be in violation of School Board Policy 341 – Controversial Issues and School Board Policy 411 – Discrimination and Harassment of Students Prohibited. The letter notified Clay that the email he sent contained his personal beliefs regarding gay marriage, a controversial topic. The letter also notified Clay that the District considered the topics discussed in his email to be irrelevant to the conversation that occurred in his classroom that day, not aligned with District curriculum, and not related to pre-designated course content. Clay was also notified that the District considered the statements he made to have created an environment in which students did not feel safe or supported in his classroom, which was counter to the District's goals around equity and inclusion.

Clay's leave was designated as unpaid retroactively, effective December 4, 2019, and Clay was notified that he would have an opportunity to present his explanation of his behavior at the December 16, 2019 school board meeting during a closed session. Clay was also notified that the school board would vote on the recommendation to terminate his employment and that he could choose to be represented at the meeting.

The Controversial Issues policy referenced in the December 10, 2019 letter states, in part, that a student shall have the right to "have the guidance of a teacher who: is impartial and objective in his/her presentation, selects materials suitable to the range, knowledge, maturity and competence of the student, provides data concerning all aspects of the issue under discussion, expresses opinions but informs students it is his/her opinion and not an

authoritative answer; brings out facts concerning controversial questions, and treats religious, moral, and ethical values and attitude with respect and sensitivity." The policy also states that "all issues discussed within the classrooms will be relevant in terms of pre-designated course content. Parents/Guardians/Students of Greendale Schools shall have a right to complain to the school administration if they believe unfair and prejudiced classroom presentations are being made." The policy further states that "the teacher who is in doubt concerning the advisability of discussing certain issues in the classroom is expected to consult with the principal."

The Discrimination and Harassment policy referenced in the December 10, 2019 letter states that harassment means "behavior toward students or staff members based, in whole or in part, on . . . sexual orientation . . . that substantially interferes with a student's school performance or a staff member's work performance or creates an intimidating, hostile or offensive school and/or work environment." The policy prohibits conduct that is discriminatory or harassing.

At the school board meeting, the board discussed Clay's termination in a closed session. Grotophorst provided, to the school board, a summary of the investigation, the District's findings, and the recommendation for termination. The board allowed Clay an opportunity to respond to the recommendation for termination. He answered questions from board members as well as a lawyer that was present. Clay does not believe that he discussed his religion at the board meeting.

The school board privately deliberated about the recommendation for termination. Ultimately, the District terminated Clay's employment. Clay was not terminated for the actions that occurred in the classroom (i.e.,

his in-person conversation with students). Clay is the only employee who had been terminated during Weiss' tenure as principal.

### 3.4    Clay's Religion and His Employment at Greendale

Clay identifies as Protestant Christian. Clay has identified as a Protestant Christian since 1984. He believes that marriage is exclusively in God's law between a man and a woman. Clay's belief that marriage is exclusively in God's law between a man and a woman is not a consistent belief among all congregations of Protestant Christians. Some congregations of Protestant Christians accept gay marriage as a platform and belief.

Clay recalls telling Weiss in January 2019 that he was a devout Christian and that his grandfather was a preacher. Clay does not recall Weiss having a response to Clay mentioning that he is a devout Christian. Clay told Weiss about his religious background and grandfather because he wanted to impress Weiss, on Martin Luther King Jr. Day, by telling him that his grandfather worked with civil rights leaders during the civil rights movement. The conversation on Martin Luther King Jr. Day took place inside the school's foyer, in passing, while Weiss was on "morning duty," which involves serving as a hall monitor. No other individuals overheard the conversation between Weiss and Clay. Weiss, for his part, does not recall having a conversation with Clay regarding his religious background.

Other than the email that he sent to the students, Clay never told anyone at Greendale what his position was on gay marriage. Clay's email to the students does not mention that he is a Protestant Christian, and Clay does not recall mentioning his religion in his meeting with Weiss and Grotophorst. Clay does not believe that the District understood that his opposition to gay marriage was related to his religious beliefs. Clay is also

aware of, and knows people, who are not religious and who oppose gay marriage.

Amidzich believes that the legalization of same-sex marriage is a controversial political issue. Greendale Middle School staff would be allowed to wear clothing indicating support for gay marriage but would not be allowed to wear clothing indicating opposition to gay marriage. A Greendale Middle School social studies teacher, Erin McCarthy ("McCarthy"), has displayed a Pride flag in her classroom since the 2018–2019 school year. McCarthy added the Pride flag to her classroom after her students voted to have the flag included. In her classroom, McCarthy displays other flags representing countries and cultures around the world, but she hangs no other non-territorial flags like the Pride flag. McCarthy does not express her personal opinion on controversial issues to her students. Greendale Middle School staff would be allowed to wear a Catholic cross around their neck as an expression of their religious beliefs. Weiss believes there is a difference between stating support for a group and stating opposition to a group.

## 4.  ANALYSIS

### 4.1  Discrimination Based on Religion

"Title VII makes it unlawful for an employer to discharge or discipline an employee because of that person's religion." *Martino v. W. & S. Fin. Grp.*, 715 F.3d 195, 201 (7th Cir. 2013). The Court must look to the body of evidence of discrimination as a whole and determine whether a reasonable juror could infer that Clay was terminated because of his religion. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016); *see also Reives v. Ill. State Police*, 29 F.4th 887, 892 (7th Cir. 2022) ("The determinative question in discrimination cases is whether the evidence would permit a

reasonable factfinder to conclude that the plaintiff's [membership in a protected class] . . . caused the discharge or other adverse employment action.") (internal quotations and citations omitted).

A plaintiff may survive summary judgment by (1) "provid[ing] either direct or circumstantial evidence that supports an inference of intentional discrimination;" or (2) "enlist[ing] the burden-shifting framework of *McDonnell Douglas*." *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 929 (7th Cir. 2020) (citing *McDonnell Douglas Corp. v. Green Eyeglasses*, 411 U.S. 792 (1973)). The first approach is the broadest—it allows a court to aggregate the evidence and holistically determine whether there is a genuine issue of material fact that is better left for a factfinder to review. The *McDonnell-Douglas* test is simply a formalized framework by which parties may discuss the evidence; it often helps the parties and the courts to fully capture the evidence presented. *Reives*, 29 F.4th at 892 ("[The *McDonnell-Douglas* test] remains an efficient way to organize, present, and assess evidence in discrimination cases.") (internal citations and quotations omitted).

### 4.1.1   Evidence Supporting an Inference of Discrimination

"In order to make out a case of . . . discrimination without resorting to *McDonnell Douglas*, a plaintiff must provide either direct or circumstantial evidence that supports an inference of intentional discrimination." *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 563 (7th Cir. 2009). Defendants argue that Clay has failed to provide any evidence, direct or circumstantial, that would support an inference of discrimination. Clay responds that he has offered enough evidence such that a jury could agree that Defendants could infer Clay's religious beliefs from his conduct, and

Case 2:21-cv-00066-JPS   Filed 05/06/22   Page 10 of 21   Document 21

that it was Clay's beliefs, not his conduct (i.e., the email), that precipitated his termination.

In *Grossman v. South Shore Public School District*, 507 F.3d 1097 (7th Cir. 2007), the Seventh Circuit upheld the district court's grant of summary judgment to defendants in a similar situation. The plaintiff, a public-school guidance counselor on a probationary contract, was discovered to have thrown out literature concerning the use of condoms and replaced it with literature advocating abstinence, and to have prayed with two students on separate occasions. *Id.* at 1098. At the end of her probationary period, the school did not extend her contract. *Id.* At a hearing on her contract extension, the plaintiff learned that, despite her otherwise exemplary performance, the school based its decision on "philosophical differences." *Id.* The plaintiff sued under Title VII, and the district court granted summary judgment to the school. *Id.*

On appeal, the Seventh Circuit wrote, "[t]he issue is whether the plaintiff's specific religious beliefs were a ground for her not being retained." *Id.* The court discussed whether "the plaintiff was let go not because of her beliefs but because of her conduct." *Id.*

> Teachers and other public school employees have no right to make the promotion of religion a part of their job description and by doing so precipitate a possible violation of the First Amendment's establishment clause . . . . It would be different if the plaintiff's religious conduct had merely tipped off her supervisors to the fact that she held religious beliefs that they find repulsive and it was her beliefs, not her conduct, that precipitated their refusal to renew her contract . . . but there is too little evidence to create an issue for trial. The only religious beliefs that the plaintiff's conduct signaled were that teenage sex is bad and that prayer is efficacious, and these views are almost certainly shared by the Christian school administrators who decided not to renew her contract . . . .

> The reference [in the hearing] to her preferring abstinence as
> a strategy for preventing teenage pregnancy to contraception
> (and likewise the references to her "belief" in abstinence and
> her not making a "good fit" with the school) related to her
> *approach* to the problem of teenage pregnancy rather than to
> her theological views. Those views were the *cause* of her
> approach, but so far as the record shows it was the approach
> that concerned the school administrators.

*Id.* at 1099.

Under *Grossman*'s guidance, the record before the Court establishes that Defendants acted upon Clay's conduct, not his beliefs. Clay's email signaled only his views on gay marriage—not their basis in religion. His approach to his perceived problem of students accusing him of being discriminatory was to send an unsolicited email from his work account to a limited group of his French students on a topic that was far beyond the scope of his foreign-language curriculum. That email generated student and parent complaints, made students uncomfortable, and led to a student not wanting to return to Clay's classroom. Moreover, Grotophorst provided witness testimony, as included in the stipulated statement of facts, that she felt that Clay's email created an environment in which students did not feel safe or comfortable in Clay's classroom.

Further, the inference of religious-based discrimination is even more removed from that in *Grossman*. Unlike in *Grossman*, Clay's religion did not come up a single time during the investigation or at his hearing. As stated in the stipulated statement of facts, Clay does not believe that the District understood that his opposition to gay marriage was related to his religious beliefs. The parties do not dispute that Weiss does not recall having the 2019 conversation with Clay regarding his religious background; Clay admits that Weiss had no response to him mentioning that he was a devout

Christian during this forgotten conversation. *Reed v. Great Lakes Cos.*, 330 F.3d 931, 934 (7th Cir. 2003) ("It is difficult to see how an employer can be charged with discrimination on the basis of an employee's religion when he doesn't know the employee's religion.").

Additionally, Clay cannot argue that Defendants could have, or should have, inferred his religious beliefs solely from his opposition to gay marriage. Not only did Clay not tell anyone that his opposition to gay marriage was based in religion, but he admits that there are Protestant Christians who support gay marriage and that entire congregations accept it as a platform and belief. *C.f. Grossman*, 507 F.3d at 1100 ("She makes the strange argument that her advocacy of abstinence and disapproval of contraception marked her as an evangelical Christian, forgetting that the Catholic Church considers the use of contraceptives a mortal sin and that most other Christian sects as well disapprove of nonmarital sex."). The evidence before the Court demonstrates that it was Clay's conduct, and the effect of that conduct on students, that led to his termination—not his religious beliefs on their own. While his religious views "were the *cause* of [his] approach . . . it was the approach that concerned the school administrators," not the beliefs. *Grossman*, 507 F.3d at 1099.

### 4.1.2 *McDonnell Douglas* Burden Shifting

Still though, as the parties brief it, the Court must review the case under the *McDonnell-Douglas* test. To establish a case of Title VII discrimination under the *McDonnell-Douglas* burden-shifting method, a plaintiff "must make a prima facie case of discrimination by showing that they (1) belong to a protected class; (2) performed their job according to the [defendant's] legitimate performance expectations; (3) suffered an adverse employment action; and (4) were treated less favorably compared to

similarly situated employees outside of the protected class." *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 364 (7th Cir. 2009). Then, if the plaintiff can meet his burden, "the burden shifts to [the defendant] to set forth a legitimate, nondiscriminatory reason for its employment decisions." *Id.* If the defendant succeeds, "the burden shifts back to [the plaintiff] to explain why the [defendant's] proffered justification is pretext for discrimination." *Id.* To show pretext, the plaintiff must show that the defendant's stated reason was a "lie, specifically a phony reason for some action." *Martino v. W. & S. Fin. Grp.*, 715 F.3d 195, 202 (7th Cir. 2013) (internal quotation and citation omitted).

The Court will not discuss the initial burden because even if Clay meets the initial burden, his claim fails because he cannot rebut whether Defendants terminated him pretextually. As discussed above, Defendants did not know that the content of Clay's email was based on his religious convictions. Clay states that he does not believe that the District understood that his opposition to gay marriage was related to his religious beliefs. He cannot make such a statement in a deposition, stipulate to it in motions practice, and then turn around to argue that it "defies common sense" that Defendants were unaware of his religious beliefs. Defendants cannot lie to conceal that they terminated Clay based on his religious convictions when Defendants had no knowledge that his position on gay marriage was based on his religion convictions to begin with.[2]

---

[2]To the extent that Clay wishes to argue that Defendants discriminated against him for the belief he conveyed in his email (divorced entirely from its basis in a particular religion), such an argument is better addressed in his claim brought under the First Amendment. In many cases, the First Amendment is disinterested in whether a belief arises from religion.

### 4.2     First Amendment Retaliation

Clay also claims that Defendants fired him in retaliation for exercising his First Amendment rights, namely engaging in constitutionally protected speech. Defendants argue that Clay was not engaged in constitutionally protected speech when he sent his email, and, therefore, he cannot proceed with an argument that he was retaliated against in violation of the First Amendment.

The First Amendment is subject to certain limitations within the context of public education. Public schools can discipline both students and teachers for their speech in certain situations. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988); *Mayer v. Monroe Cnty. Cmmty. Sch. Corp.*, 474 F.3d 477, 480 (7th Cir. 2007). The Seventh Circuit has stated that the First Amendment does not entitle primary and secondary teachers, when conducting the education of captive audiences, to cover topics or advocate viewpoints that depart from the curriculum adopted by the school system. *Mayer*, 474 F.3d at 480.

For example, in *Mayer*, a student asked a teacher whether she participated in political demonstrations. *Id.* at 478. The teacher responded by saying that when she passed a demonstration against the nation's military operations in Iraq and saw a placard that said, "honk for peace," she honked her car's horn to show support for the demonstrators. *Id.* Parents complained about her in-class comment, and the teacher alleged that the incident led to her termination. *Id.* She brought a claim under § 1983 alleging that the school violated the First Amendment by terminating her because she took a political stance during a current-events session in her class. *Id.*

Case 2:21-cv-00066-JPS   Filed 05/06/22   Page 15 of 21   Document 21

In analyzing Mayer's claim, the Seventh Circuit noted that it previously had held that public-school teachers "[do] not have a constitutional right to introduce [their] own views . . . but must stick to the prescribed curriculum—not only the prescribed subject matter, but also the prescribed perspective on that subject matter." *Id.* at 479 (citing *Webster v. New Lenox Sch. Dist. No. 122*, 917 F.2d 1004 (7th Cir. 1990)). The court explained that a school system "does not 'regulate' teachers' speech as much as it *hires* that speech," noting, in example, that a teacher hired for social studies cannot use his position as a platform for a "revisionist perspective" of history, contrary to the approved curriculum. *Id.* The court also noted that it is important to consider that pupils are a captive audience—their presence in a classroom is compulsory. *Id.* "Children who attend school because they must ought not be subject to teachers' idiosyncratic perspectives." *Id.* As a result, the court affirmed the dismissal of Mayer's claim because the First Amendment did not entitle her "to cover topics, or advocate viewpoints, that depart from the curriculum adopted by the school system." *Id.* at 480.

Implicit in this exception, however, the Court must determine whether Clay sent his email "as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). "If the answer is no, [Clay] has no First Amendment cause of action based on his . . . employer's reaction to the speech." *Id.* "If the answer is yes, . . . [t]he question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.* This is an often difficult inquiry. *Id.* In the Court's final inquiry, it must consider that "[s]o long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are

necessary for their employers to operate efficiently and effectively." *Id.* at 419. The question is resolved by "balanc[ing] between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 568 (1968).

The parties dispute whether Clay sent his email as a citizen or as a public-school teacher.[3] The Court readily agrees with the long line of cases that declare that teachers and students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). A school district cannot regulate everything a person says simply because that person is a teacher. Instead, the "critical question" is whether the teacher's speech is that which is "ordinarily within the scope of an employee's duties." *Lane v. Franks*, 573 U.S. 228, 240 (2014). For reasons obvious, this inquiry "is a practical one." *Garcetti*, 547 U.S. at 424. An "excessively broad job description" amounts to an abridgement of free speech. *Id.*

Clay argues that, unlike the teachers in *Mayer* and *Webster*, his speech did not occur during regular classroom instruction. Rather, his speech was an after-school email sent to only a select group of students, and it concerned an earlier conversation that occurred *between* class periods, not *during* class. *See Mayer*, 474 F.3d at 479 ("Mayer concedes that the current-events session, conducted during class hours, was part of her official duties."); *Webster*, 917 F.2d at 1006–07 (analyzing a teacher's demand to

---

[3]The parties do not dispute whether the email concerned a topic of public concern (i.e., gay marriage).

teach creation science as part of his science-class instruction). While these differences are informative, the Court cannot ignore the countervailing facts.

Clay sent his email using his public-school email address to only his public-school students at their public-school email addresses. When composing the email, Clay viewed and presented himself in the role of the students' teacher. He opened the email with a summary of the instruction period. He stated, "I support all of my Frenchy students," and he closed the message with teacherly advice ("it is best in society that we respect one another's differences"). His shift from discussing his French-language coursework to gay marriage, while punctuated with a transitional phrase and a disclaimer that his viewpoint was his own, was written under the same subject line: "in our French class." He was using a method of communication that teachers in the District use to communicate matters of classroom instruction; the parties agree that, "[g]enerally, teachers email students using the District's email system for curriculum or instruction related purposes." ECF No. 15 at 3. Because school email is generally used for curriculum and instruction, students must check their email accounts— they are "captive audiences" even outside of the traditional classroom. Clay was actively engaged with his duties as a teacher when he authored the email.

Clay opens his brief with an argument that he hopes will belie his entire case: that, even if he was acting as a teacher when he sent his email, the email did not, in fact, violate any school policy. Specifically, he discusses District policies 411 ("Discrimination and Harassment of Students Prohibited") and 341 ("Controversial Issues"). The first prohibits certain behaviors, including, "referring to students in a demeaning or

marginalizing way" and defines harassment as "behavior toward students or staff members based, in whole or in part, on . . . sexual orientation . . . that substantially interferes with a student's school performance . . . or creates an intimidating, hostile, or offensive school and/or work environment." ECF No. 17 at 3. The second policy states, in part, that a teacher may express their personal opinions so long as they "inform students it is his/her opinion and not an authoritative answer . . . and treat[] religious, moral, and ethical values and attitudes with respect and sensitivity." *Id.*

At least as to this section of the Controversial Issues policy, Clay's email appears to be in compliance. He disclaimed his discussion of gay marriage as being his opinion. But the Court need not reach an answer as to whether Clay violated the specifics parts of the policies that he addresses. As Defendants discuss, Clay ignores an important excerpt of the Controversial Issues policy, which requires that a teacher's speech while conducting their job duties be germane to the subject-matter of their course: "[a]ll issues discussed within the classrooms will be relevant in terms of pre-designated course content." *Id.* at 4.

Gay marriage—more precisely, a teacher's individual opinion on gay marriage, the referendum votes of citizens of a state 2,000 miles away, and a Supreme Court opinion—is irrelevant to a French foreign-language class, whether the topic is disclaimed or not. This is not a factual dispute, despite Clay's attempts to characterize it as one. Clay offers no argument as to how his discussion of gay marriage was in line with this part of the District's policy. A plain reading of the relevant clause of the policy demonstrates that Clay's email, which he sent while acting in his capacity

as a French-language teacher, was wholly irrelevant to his curriculum and violated school policy.

The record demonstrates that Clay sent his email as a public-school teacher, not as a citizen, and his speech was subject to district policies. Moreover, Clay's designated curriculum did not cover gay marriage or social studies. As a public school teacher at Greendale Middle School, Clay conducted the education of a captive audience. As such, he was not entitled to cover topics or advocate viewpoints that departed from his French-language curriculum.[4] The inquiry ends here. Clay "has no First Amendment cause of action based on his . . . employer's reaction to the speech." *Garcetti*, 547 U.S. at 418.[5]

### 4.3   Tortious Interference

Clay's only remaining claim is that Defendants tortiously interfered with his employment contract in violation of Wisconsin law. "When federal claims drop out of the case, leaving only state-law claims, the district court has broad discretion to decide whether to keep the case or relinquish supplemental jurisdiction over the state-law claims." *RWJ Mgmt. Co. v. BP Prod. N. Am., Inc.*, 672 F.3d 476, 478 (7th Cir. 2012). "A general presumption in favor of relinquishment applies." *Id.* In this case, that presumption carries

---

[4]"Majority rule about what subjects and viewpoints will be expressed in the classroom has the potential to turn into indoctrination . . . . But if indoctrination is likely, the power should be reposed in someone the people can vote out of office, rather than tenured teachers . . . . The Constitution does not entitle teachers to present personal views to captive audiences against the instructions of elected officials." *Mayer*, 474 F.3d at 479–80.

[5]The Supreme Court has recently taken up for review a case presenting a similar issue to Clay's case. *See Kennedy v. Bremerton Sch. Dist.*, 991 F.3d 1004 (9th Cir. 2021), *cert. granted*, 142 S. Ct. 857 (2022). The outcome in that case may affect the law cited by the Court in this Order.

the day. The Court will not extend supplemental jurisdiction over Clay's tortious interference claim. 28 U.S.C. § 1367(c)(3).

**5. CONCLUSION**

For the reasons explained above, the Court will grant Defendants' motion for summary judgment. Clay's claims under Title VII and the First Amendment are dismissed with prejudice; his claim for tortious interference under Wisconsin law is dismissed without prejudice.

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment, ECF No. 14, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff Robert Clay, Jr.'s claims under Title VII and the First Amendment be and the same are hereby **DISMISSED with prejudice**;

**IT IS FURTHER ORDERED** that the Court, pursuant to 28 U.S.C. § 1367(c), declines to exercise supplemental jurisdiction over Plaintiff Robert Clay, Jr.'s claim for tortious interference under Wisconsin law, and this state-law claim be and the same is hereby **DISMISSED without prejudice**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED.**

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 6th day of May, 2022.

BY THE COURT:

_____
J.P. Stadtmueller
U.S. District Judge